UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TONY GIBSON,

       Plaintiff,

v.

UNITED AIRLINES, INC.,

       Defendant.

_____/

Hon. Victoria A. Roberts

Case No. 10-14451

**ORDER**

**I.    Introduction**

This matter is before the Court on Defendant's Motion for Summary Judgment. (Doc. 6). The Motion has been fully briefed, and oral argument was held on March 2, 2011.

The Motion is **DENIED**.

**II.    Background**

Plaintiff Tony Gibson began working at Defendant United Airlines in August of 1990. From 1997 until his discharge in 2008, Plaintiff held the position of Service Director Elite in the Global Services Department. Plaintiff handled calls from customers who experienced problems or difficulties with United's services. If a customer asked to speak with a supervisor, he was one of the persons who could take the call.

At the time of his discharge, Plaintiff also held the position of Union Committeeman for the International Association of Machinists and Aerospace Workers.

As part of this position, he was involved in investigating and assisting employees with grievances.

On September 26, 2008, Plaintiff testified at a deposition on behalf of co-worker Deborah Coats-Hall, who brought a race discrimination claim against Defendant. Besides Plaintiff, only the parties' attorneys were present at the deposition; however, Plaintiff says that he told two of his supervisors, Beverly Barfield[1] (Regional Manager of the Detroit Customer Contact Center) and Collette Jackson (Sales Supervisor for Global Services), that he was asked to testify.  Plaintiff says that he did not tell Jackson the substance of his testimony, but that he and Barfield discussed the substance of his testimony in detail.  According to Plaintiff, Barfield was upset with what Plaintiff said during his deposition.

On October 17, 2008, approximately 3 weeks after his testimony, a Reservation Sales and Service Representative transferred a customer call to Plaintiff because the customer was unhappy and asked for a supervisor.  During that call, Plaintiff and the customer talked over one another, Plaintiff placed the customer on hold five times, and the customer threatened to get Plaintiff fired.  The customer was furious with how Plaintiff handled the call, and sent a detailed complaint letter to Defendant.  This letter was given to Kathy Page, a Labor Relations Representative, for investigation. At the end of the investigation, Defendant suspended Plaintiff, pending the processing of discipline for violating employee Rules of Conduct.

---

[1] Beverly Barfield was originally referred to as Beverly Barfield-Terrell in the parties' briefs.  The Defendant informed the Court that "Terrell" has been dropped from her name.

Page contacted Barfield and recommended Plaintiff be subject to Level 5 discipline–immediate dismissal.  Afterwards, Barfield asked Thomas Renville, the Regional Manager of Chicago, to preside over the final Investigative Review Hearing and issue appropriate discipline.

As part of Defendant's disciplinary process, it gave Plaintiff an Investigative Review Hearing, where supervisors Melody Hoffman and Patti Flores represented Defendant's case for why Plaintiff's actions warranted termination. Plaintiff's union represented him.

Renville found that Plaintiff violated Rules 20 and 41 of the employee Rules of Conduct, and that Level 5 termination was warranted.  On December 18, 2008, Plaintiff was discharged in a written decision by Renville, signed by Barfield on Renville's behalf.

Subsequently, the Union filed a grievance on Plaintiff's behalf, and the parties eventually reached a settlement.  In May of 2009, Plaintiff was reinstated as a Customer Reservations Sales and Service Representative, without back pay, as a result of the settlement.

On December 23, 2009, Plaintiff filed suit in state court against United Airlines, Melody Hoffman, and Patti Flores, alleging violation of the Elliott-Larsen Civil Rights Act and intentional infliction of emotional distress.[2]  Subsequently, both Flores and Hoffman were voluntarily dismissed from the suit, and Defendant removed the suit to federal court based on diversity jurisdiction.

_____

[2] Intentional infliction of emotional distress is not addressed as a separate count in the Complaint, and neither party addresses it in their briefs.  It appears that the Plaintiff has abandoned this claim.

Plaintiff says that he was fired in retaliation for testifying on his co-worker's behalf.

## III.  Standard of Review

Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  In reviewing a motion for summary judgment, "the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion."  *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986).

The movant has the initial burden to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant meets this burden, the nonmoving party must, by affidavit or otherwise as provided by Rule 56, "set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  If the nonmoving party does not respond with specific facts showing a genuine issue for trial, summary judgment is appropriate.  *Emmons v. McLaughlin*, 874 F.2d 351, 353 (6th Cir. 1989).

## IV.    Law & Analysis

### A. Michigan's Elliott-Larsen Civil Rights Act

Under the Elliott-Larsen Civil Rights Act (ELCRA):

"a person shall not . . . retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL 37.201(a).

### 1.   Plaintiff establishes a prima facie case of retaliation.[3]

"To establish a prima facie case of retaliation under the Civil Rights Act, a plaintiff must show (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Meyer v. City of Center Line,* 242 Mich. App. 560, 568-69 (Mich. App. Ct. 2000).

Defendant does not dispute that: (1) Plaintiff engaged in the protected activity of testifying under oath in a deposition in support of a case for racial discrimination against Defendant,[4] (2) Defendant (through Barfield) knew of Plaintiff's testimony, and (3) Plaintiff suffered an adverse employment action when he was terminated.  However, Defendant says that Plaintiff's claim fails because he cannot establish a causal connection.  Defendant says that Renville was the ultimate decision maker in Plaintiff's

---

[3] Plaintiff does not contend that he has direct evidence of retaliation.

[4] Although Plaintiff also contends that his participation in internal investigations and assistance with claims filed with the Michigan Department of Civil Rights are also protected activities for which he was retaliated against, Defendant points out these are not identified as protected activities in the Complaint.  The Complaint identifies only Plaintiff's deposition testimony.

termination, and Renville did not know of Plaintiff's testimony; thus, there is no connection between the testimony and his termination. The Court believes a genuine issue of material fact exists with respect to this element.

"To establish causation, the plaintiff must show that his participation in the activity protected by the [ELCRA] was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett v. Kirtland Comty. Coll.,* 245 Mich. App. 306, 315 (Mich. App. Ct. 2001). Furthermore, temporal proximity alone is insufficient to show a causal connection. *West v. General Motors Corp.,* 469 Mich. 177, 186 (2003).

In a retaliation case, the identity of the decision maker is relevant to show causation because "[a] plaintiff who has engaged in a protected activity must demonstrate the decision maker's awareness of the plaintiff's participation in a protected activity and that the plaintiff 'suffered an adverse employment action as a result of her engaging in the protected activity, i.e., that there was some nexus or causal connection between the adverse employment action and the protected activity.'" *Ramanathan v. Wayne State Univ.,* 2010 WL 1330290 at *8 (Mich. App. Ct. April 6, 2010) (quoting *Garg v. Macomb Cnty. Cmty. Mental Health Serv.,* 472 Mich. 263, 276 n. 5 (2005)). Generally, when a purported decision maker does not know of a plaintiff's protected activity, the plaintiff cannot establish a causal connection. *See Newman v. Lear Corp.,* 2006 WL 171146 at *2 (Mich. App. Ct. Jan. 24, 2006); *Garg v. Macomb Cnty. Cmty. Mental Health Serv.,* 472 Mich. 263, 275 (2005).

Although not succinctly stated, Plaintiff appears to advance two reasons, besides temporal proximity, why there is a causal connection: (1) Barfield approved or

recommended both the decision to bring Level 5 charges against Plaintiff in the first place, and the ultimate termination decision; and (2) Barfield exerted influence over the information on which Renville relied when deciding to discharge Plaintiff. According to Plaintiff, Barfield's fingerprints are clearly on the decision to terminate him.

### (a)  Did Barfield have authority to approve/ disapprove the decision to fire Plaintiff?

Although Plaintiff does not directly assert that Barfield was involved in the ultimate decision to fire him, he does emphasize that Barfield signed the decision to terminate him. The Court construes this as a claim that Barfield was involved in or approved the decision.

Taking the evidence in the light most favorable to Plaintiff, there is a question of fact as to whether Barfield approved the decision.

In a sworn affidavit, Kathy Page says that she was responsible for investigating the complaint against Plaintiff. She says that she made the decision to recommend Level 5 discipline, after consulting with Melody Hoffman. Page says that Barfield had no input regarding the recommended level of discipline for Plaintiff. However, after Page made the decision to recommend a level 5 discipline, she "informed Ms. Barfield for the purpose of setting up the Investigative Review Hearing with Plaintiff's Union and a hearing officer."

Barfield swears that she did not participate in the investigation into Plaintiff's alleged misconduct. She says that after Page informed her of the recommended discipline, she asked Renville to preside over the Investigative Review Hearing. She says she did not discuss any substantive aspect of Plaintiff's alleged misconduct with

Renville, and did not attend the hearing or help prepare anything for it.  She also swears that she did not direct any other employees to misrepresent any policies during the hearing. She says that she received a copy of Renville's decision by e-mail on December 18, 2008, and signed the decision on Renville's behalf, but had no input into the outcome of the decision.

It is unclear whether Page was required to get Barfield's approval to recommend Level 5 discipline.  It is also unclear why Page called Barfield and why Barfield had to set up the hearing.  Plaintiff claims that Barfield was the person who recommended the discipline, and was the only supervisor with the power to recommend Level 5 discipline against him.

It is also unclear whether Barfield had the authority to approve or disapprove of Renville's decision.  Although inartfully stated, Plaintiff's emphasis of the fact that Barfield signed Renville's termination decision appears to be a claim that Barfield approved the decision.  Defendant claims that Barfield signed on Renville's behalf "only as a formality and that she played no part in making the decision to terminate Plaintiff." At the hearing, Defendant stated that Barfield signed to make it "official" for the Union.

It is unclear whether the "formality" was a requirement that someone sign the decision to terminate Plaintiff in order to give effect to the decision, or that Barfield sign to evidence her approval of the decision by Renville, who did not manage the region in which Plaintiff was employed.  In either case, the Court finds it unlikely that Barfield's signature on behalf of Renville evinced no approval or authority over the decision.  The fact that she was an appropriate person to sign on Renville's behalf, which Defendant does not dispute, itself tends to show that she had authority over or approved of the

decision.  Further, it is unlikely that Barfield would have signed on Renville's behalf had she disapproved of the decision.

Taking Plaintiff's testimony as true, and viewing the evidence in the light most favorable to Plaintiff, there is a question of fact as to whether Barfield approved Page's recommendation of Level 5 discipline or approved the decision to terminate Plaintiff. *See Newman v. Lear Corp.,* 2006 WL 171146 at *2 (Mich. App. Ct. Jan. 24, 2006) (where both the initial recommender of termination and the ultimate decision maker are unaware of protected activity, a plaintiff can still establish causation where a person with approval/ disapproval authority over the decision is aware of the protected activity, and exercises that authority to retaliate).

### (b)  Did Barfield influence Renville's decision to fire Plaintiff?

Additionally, Plaintiff argues that Barfield, in retaliation for his testimony, essentially set him up to be discharged, while attempting to sterilize the decision by asking Renville to preside over the hearing. Plaintiff says that because of Barfield's actions, the entire process was tainted.  Thus, while there is no evidence that Renville was aware of the protected activity or possessed a retaliatory motive, the purpose of the write up and investigation itself was to retaliate against Plaintiff and cause his termination.

Although Plaintiff cites no cases directly on point, the Michigan Supreme Court holds that where a supervisor with an unlawful motive orchestrates a plan to adversely impact an employee, the supervisor's animus can be imputed to the adverse decision makers. *See Rasheed v. Chrysler Corp.,* 445 Mich. 109, 136-37 (1994). Thus, "[w]here a supervisor consciously works toward the opportunity to employ a neutral mechanism .

. . in order to accomplish a discriminatory purpose, the mechanism can no longer be considered neutral." *King v. Denton Township,* 2004 WL 1505505 at *3 (Mich. App. Ct. July 6, 2004) (citing *Sumner v. Goodyear Tire & Rubber Co,* 427 Mich. 505, 540-41 (1986), *overruled on other grounds by Garg v. Macomb Cnty Community Mental Health Serv.,* 472 Mich. 263 (2005)).

Similarly, federal courts construing Title VII recognize that an employer can be held liable where a supervisor unaware of protected activity adversely impacts a Plaintiff's employment, if the decision is somehow tainted by another's discriminatory animus.

"When an adverse . . . decision is made by a supervisor who lacks impermissible bias, but that supervisor was influenced by another individual who was motivated by such bias, . . . the employer may be held liable under a 'rubber stamp' or 'cat's paw' theory of liability." *Arendale v. City of Memphis,* 519 F.3d 587, 604 n. 13 (6th Cir. 2008); *see also EEOC v. BCI Coca-Cola Bottling Co.,* 450 F.3d 476, 484 (10th Cir. 2006) ("In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action."). "When a decisionmaker acts in accordance with a retaliator's bias 'without himself evaluating the employee's situation,' the retaliator 'clearly causes the tangible employment action, regardless of which individual actually' enforces the adverse transfer or termination." *Roberts v. Principi,* 283 Fed. Appx. 325, 333 (6th Cir. 2008) (quoting *Llampallas v. Mini-Circuits, Lab, Inc.,* 163 F.3d 1236, 1249 (11th Cir. 1998)).  Thus, the decisionmaker becomes merely a conduit for the retaliator's animus. *Id.*

While Michigan courts "are not bound by federal precedent based on Title VII, those precedents analogous to questions presented under the [ELORA] are persuasive and [are] afforded substantial consideration . . . ." *Barrett,* 245 Mich. App. at 314.  Here, federal courts' analyses of similar issues are particularly persuasive because the Michigan Court of Appeals, in an unpublished opinion, used similar analysis.  *See Ramanathan v. Wayne State Univ.,* 2010 WL 1330290 at *11 (Mich. App. Ct. April 6, 2010).   Accordingly, when a plaintiff has presented evidence upon which a juror could find that a supervisor's or subordinate's retaliatory animus impacted the decision maker's decision, that retaliatory animus is imputed to the decision maker. *See id.* at *10.  "However, when a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Id.*

Plaintiff presents no evidence that Renville knew of the testimony; however, Plaintiff says that his claim lies with Barfield. Plaintiff says Barfield wrote Plaintiff up for doing what she knew he had been directed to do by his supervisors, and then "refused to accurately depict" the policy which he was obeying.  Plaintiff contends that this misleading information from Barfield, combined with Barfield's refusal correct the misrepresentations in the investigation, influenced Renville's decision.

Plaintiff claims that he handled the call the way that his supervisors had instructed him to do since the mid 1990s.  He says that his supervisors instructed Service Directors, like himself, to ask customers who were angry or unwilling to listen to "elevate the conversation" and then, if they did not, place the customer on hold.  This was supposed to give the customer time to calm down, and allow the employee to gain

control of the conversation.  Furthermore, he says that this exact policy, which he claims he followed, is now being officially taught to Customer Reservations Sales and Service Representatives (agents below Plaintiff's position at the time).

As a Service Director, he says that he was taught this policy by his managers long ago, and that placing a customer on hold under this policy did not constitute misuse of the hold button. In fact, Plaintiff says he spoke with Barfield on several occasions about what actions constituted misuse of the hold button (presumably because Rule 20 is not very specific); Plaintiff says that based on what she told him, his actions were not a violation of Rule 20.  For example, Plaintiff says the Barfield told him that misuse of the hold button included putting customers on hold so long that they hang up; putting a customer on hold and walking around; and putting a customer on hold and leaving the building.  Plaintiff says that the policy, as it was explained to him, meant that putting a customer on hold to give them time to calm down and regain control of the conversation, was not a misuse of the hold button.

Plaintiff says that "Barfield-Terrell and his [other] supervisors intentionally lied and stood mum during plaintiff's hearing before Renville, and directly caused his termination by falsely and deliberately misleading Renville, not telling the truth, and punishing plaintiff for his testimony." Pl. Resp. Br. 2.  Essentially, Plaintiff claims that by writing him up for following a policy as he was told, Barfield lied about his alleged misconduct and the policy itself.  Additionally, Plaintiff says that Barfield and his other supervisors intentionally withheld important information from Renville to ensure Plaintiff was fired.  Plaintiff claims that Barfield caused his termination by using Renville, who may not have known that Plaintiff had been instructed to place customers on hold in this

Page 12 of  21

manner by his supervisors, to fire him.  Plaintiff says this was retaliation for his testimony.

Several issues of material fact are in dispute. Defendant disputes that Barfield is the person who brought charges against Plaintiff for allegedly mishandling the call. Defendant says that it was Kathy Page, a Labor Relations Specialist, who investigated the matter and decided that Level 5 charges should be brought against Plaintiff. Defendant says that Barfield was not part of the decision to bring level 5 charges, nor was she consulted about the decision.  The Court notes that Defendant does not deny that Barfield had retaliatory animus against Plaintiff.

Additionally, Defendant disputes that Plaintiff was ever trained to put angry customers on hold.  Defendant points out that one of Plaintiff's supervisors, Terrance Landowski, who Plaintiff claims taught him to do so, denied this in his deposition.

The Court cannot weigh evidence or determine credibility when deciding a motion for summary judgment.  There are several genuine issues of material fact in dispute, which preclude the Court from finding that Plaintiff cannot prove causation.

### (c)  Plaintiff's affidavit does not contradict his earlier deposition testimony.

Finally, Defendant asserted at the hearing that Plaintiff's affidavit claiming Barfield was involved in recommending the Level 5 discipline is contradictory to his prior deposition testimony.  The Court finds this assertion without merit.

As a rule, "a plaintiff may not create a factual issue by filing an affidavit that contradicts [his] earlier deposition testimony." *Trout v. FirstEnergy Generation Corp.,* 339 Fed. Appx. 560, 566 (6th Cir. 2009).  "If a party who had been examined at length

on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir. 1986).

In response to a question asking whether Barfield made the decision to terminate Plaintiff, Plaintiff responded, "No, she removed herself from the process."  Defendant contends that this is an admission that Barfield did not recommend or bring Plaintiff up on charges for Level 5 discipline, did not influence the investigation in any way, and did not approve the termination decision, which precludes any subsequent claim that she did.  However, viewing this response in the light most favorable to Plaintiff, the Court may not construe this statement in the way Defendant requests.

First, Plaintiff's response is ambiguous.  It is unclear whether Plaintiff's response merely meant that Barfield removed herself from presiding over the hearing, which she indisputably did, or whether Plaintiff meant that Barfield was not involved in his investigation or termination at all.  Based on the whole of Plaintiff's deposition testimony, the Court believes the latter interpretation is unreasonably constrained. Second, the specific line of questioning on which Defendant relies does not support Defendant's broad interpretation.  Plaintiff was asked:

Q. I'm just asking, other than what you've already testified to is there anything else that you're relying upon, either something someone told you or something you've read that supports your belief that the reason for your termination was because you testified in the Deborah Coats-Hall matter?

A. There's nothing else that I can think of besides the inflated discipline.  What else could it be?

Q.  That was more egregious and, therefore, because it was greater than what you had seen in other cases –

A.  Because my manager was upset –

Q.  – that you think it has to be.

A.  I'm sorry.  Go ahead, I'm sorry.

Q.  What about your manager?

A.  Because my manager was upset when I came back and reported to her.

Q.  But you[r] manager didn't make the decision to terminate in this case, did she?

A.  No, she removed herself from the process.

Q.  Right.  And you don't know –you don't have any knowledge that she had any discussion with Mr. Renville about the fact that you had testified in this matter a number of months previously?

A.  I can assume that she spoke to Mr. Renville, inflated the phone call, got him to lean in her direction, so I was separated.  I can assume that she sent the supervisors to get me also.

Q.  You said that's an assumption.  You don't have any knowledge of that, personal knowledge?

A.  If I had pure fact –

Q.  Yes.

A.  – it would be in my counsel's hands.

Q.  And you don't have any pure facts in that regard?

A.  No, sir.

In sum, and taken in the light most favorable to Plaintiff, Plaintiff states that (1) Barfield

inflated his discipline, (2) it was harsher discipline than in other cases, (3) Barfield was

upset about his testimony, (4) Barfield was not the ultimate decision maker in his

termination, (5) Barfield removed herself from the hearing, (6) Plaintiff did not have any

Page 15 of  21

facts or knowledge that Barfield told Renville of Plaintiff's testimony.  Plaintiff's affidavit stating that Barfield inflated the discipline for Rule 20 violations and recommended him for immediate dismissal, does not contradict his earlier deposition testimony.

### 2. There is a genuine issue of material fact as to whether Defendant's reason for firing Plaintiff is pretext.

Once the Plaintiff establishes a prima facie case, the burden shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Hazle v. Ford Motor Co.,* 464 Mich. 456, 464 (2001).  If the Defendant meets this burden, then the Plaintiff must demonstrate that the proffered reason is a pretext. *Id.* at 464. "A plaintiff can establish pretext by demonstrating that the proffered reasons for the adverse employment action (1) had no basis in fact, (2) were not the actual factors motivating the decision, or (3) were insufficient to justify the decision." *Ramanathan v. Wayne State Univ.,* 2010 WL 1330290 at *11 (Mich. App. Ct. April 6, 2010) (citing *Dubey v. Stroh Brewery Co.,* 185 Mich. App. 561, 565-66 (Mich. App. Ct. 1990)).

Defendant says that, even if Plaintiff can make out a prima facie case, he cannot rebut Defendant's legitimate, non-retaliatory reason for his discharge–he violated Rules 20 & 41 of the employee Rules of Conduct.

Plaintiff says this is a pretext for unlawful retaliation because (1) he was brought up on charges for correctly following a policy, (2) he was given harsher punishment than others who violated the same rule, and (3) the Defendant misapplied its own Rules of Conduct.

Under Michigan law, Plaintiff cannot prove pretext simply because he disagrees with how the Defendant interprets its own policies or rules. *See Hazle,* 464 Mich. at 476

Page 16 of 21

(citing *Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, 704 (1997)) (a plaintiff may

not "simply show that the employer's decision was wrong or mistaken, since the factual

dispute at issue is whether discriminatory animus motivated the employer, not whether

the employer is wise, shrewd, prudent, or competent").  Thus, Plaintiff's claim that he

should have been disciplined, if at all, under a different rule, is insufficient to prove

pretext. *See Sybrandt v. Home Depot,* 560 F.3d 553, 558-59 (6th Cir. 2009) ("disputes

about the interpretation of company policy do not typically create genuine issues of

material fact whether a company's stated reason for an adverse employment action is

only a pretext for unlawful discrimination").

Additionally, Plaintiff's claim that a Rule 20 violation only permits Level 4

discipline, not Level 5, is insufficient.  Defendant says this is incorrect, and, in fact, the

written Rules of Conduct state: "Violations of one or more of the following Rules will

result in disciplinary action, up to and include discharge, depending on the

circumstances involved and the employee's record.  Discipline will commence at the

Level specified, except that the circumstances of the particular situation or the

employee's disciplinary record may warrant a higher Level." Rules of Conduct 7.  The

Rules then state that violation of Rule 20, which includes "misuse of the hold button,"

will result in discipline of Level 4 to Discharge.

However, Plaintiff contends that Level 5 discipline for violation of Rule 20 is

unprecedented.  He testified that after he was deposed in the Coats-Hall matter, but

before he was disciplined, Barfield explained to him that she and managers in two other

branches, Chicago and Hawaii, decided that all proposed violations of Rule 20 would be

increased to Level 5 discipline.  He suggests that this decision was made as part of Barfield's retaliatory scheme, and shows that his discipline was pretext for retaliation.

At the hearing, Defendant argued that Plaintiff was not competent to testify concerning Defendant's internal policies and procedures, and that the Court should not credit his testimony.  However, Defendant gives no reason why Plaintiff's testimony concerning what Barfield told him about Defendant's policies is inadmissible, and the Court finds none.  Taking Plaintiff's testimony as true, increasing the discipline level that applied to Plaintiff's alleged infraction is evidence of pretext.

Additionally, proof that Plaintiff's supervisors told him to behave in a certain way, told him the behavior did not constitute a violation of the Rules of Conduct, yet recommended his discipline, approved his discipline, and then taught the very same policy to others after his discharge, can be evidence of pretext.  Here, Plaintiff claims that this is exactly what happened.  Defendant denies that Plaintiff was ever taught to put customers on hold, and points out that one of Plaintiff's supervisors, Terrance Landowski, who Plaintiff claims taught him to do so, denied this in a deposition. Based on Landowski's denial, Defendant says that Plaintiff's claim is an "unsubstantiated allegation [that], without more, cannot defeat a motion for summary judgment." Defendant relies on a Michigan Supreme Court case, *Quinto v. Cross & Peters Co.,* 451 Mich. 358 (1996), for the proposition that a nonmoving party must go beyond the pleadings, and show a genuine issue of material fact though documentary evidence.

Defendant's reliance on the state court case is misguided; a federal court sitting in diversity is not bound by a state court's standard of review on a motion for summary judgment.  Federal courts must apply the standard set out in Rule 56 of the Federal

Rules of Civil Procedure.  Plaintiff's claims that his supervisors taught him this policy were made under oath, in a deposition.  Under the Federal Rules, neither a brief in support of a motion for summary judgment, nor an attached deposition or affidavit, is a pleading. *See* Fed. R. Civ. P. 7(a) (defining pleadings).   Furthermore, it is not the role of this Court on a summary judgment motion to credit the sworn testimony of one person over that of another.  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inference from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Defendant gives no reason why Plaintiff's testimony that his supervisors told him to handle calls in this manner would be inadmissible at trial, and the Court finds none. Therefore, the Court must take Plaintiff's claim as true.

Additionally, Plaintiff says that Defendant's reason for discharging him is pretext because this discipline far exceeded the discipline enforced against other similarly situated employees for violating Rules 20 and 41.  He says that, based on his personal experience as a union representative during disciplinary hearings, an employee's behavior had to be far worse than placing a customer on hold for a short time to warrant termination.  For example, he says that one agent put a customer on hold for 6 hours while he went outside to socialize, and was not fired.  He also says that multiple employees hung up on customers, but were not terminated.  He says his behavior was far less egregious, as he placed the customer on hold for only short periods of time, after telling the customer he was doing so, and he always resumed the call.  Defendant

states that Plaintiff has no evidence of this, and relies on internal memoranda given to employees saying that violation of Rule 20 may result in termination.  Defendant says that Plaintiff cannot merely rely on his own personal belief.

It is clear that a violation of Rule 20 could result in termination.  However, the memorandum from Managing Director Tony Bedalov, is no more specific about what constitutes misuse of the hold button than the employee rules of conduct.  The memorandum from Barfield, which Defendant repeatedly references, specifically emphasizes that hang-ups, which are a violation of Rule 20, may result in termination; it does not address placing a customer on hold.  Plaintiff testified that he has experienced the discipline of other employees first hand because he represented them; Defendant offers no reason why he may not testify to those experiences under oath.

For these reasons, a reasonable juror could find that Defendant's stated reason for terminating Plaintiff was pretext for unlawful retaliation; summary judgment is inappropriate.

**V. Conclusion**

Defendant's Motion is **DENIED**.

**IT IS ORDERED.**

s/Victoria A. Roberts
Victoria A. Roberts

United States District Judge

Dated:  March 8, 2011

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on March 8, 2011.

s/Linda Vertriest

Deputy Clerk